# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| **MARY JO MAY,** | | : | |
| | *Plaintiff* | : | **CIVIL ACTION** |
| | | : | |
| **v.** | | : | |
| | | : | |
| **PNC BANK,** | | : | **No. 18-2933** |
| | *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                            JANUARY 21, 2020

The parties have diametrically opposed views with respect to Ms. May's termination from her employment with PNC Bank. She contends that PNC fired her five months after she began taking pregnancy-related leave, in violation of her federally protected rights. PNC claims it had good cause to terminate Ms. May's employment.

Ms. May has brought suit against PNC for sex and pregnancy-based discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, and retaliation and interference in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* She withdrew her Title VII claims for retaliation. The Bank now seeks summary judgment on all of Ms. May's remaining claims. Upon consideration of the parties' oral and written advocacy, and the applicable case law, the Court grants summary judgment only as to the Title VII sex discrimination claim.

### BACKGROUND[1]

Ms. May's employment with PNC Bank began in 2009 when she was hired as a bank teller, rising up the ranks to become branch manager. In December 2015, Ms. May became the manager

---

[1]      Unless noted, the following facts are undisputed. All facts are construed in the light most favorable to Ms. May, the non-movant. The Court disregards those factual allegations that the parties make without any evidentiary support from the record.

of the Buckingham branch. A year later, PNC transferred Ms. May to the Morrisville branch, and she worked there as a branch manager until her termination in September 2017.

At the time of being hired, Ms. May was informed she would be required to follow PNC Bank's employee conduct policies, including the Code of Business Conduct and Ethics ("Code of Ethics"). Ms. May read these policies, and the Bank provided Ms. May with web-based training on them. As branch manager, she oversaw the branch's employees and monitored their compliance with the Code of Ethics and other conduct policies. Ms. May signed and acknowledged the Code of Ethics at her year-end reviews.

According to the Code of Ethics, employees are not to "use [their] position . . . for inappropriate personal gain or advantage to [themselves] or a member of [their] family." Code of Ethics, Loomis Decl., Ex. E, p. 9. The Code of Ethics further states that "[a]ny situation that creates a conflict of interest between personal interests and the interests of PNC should be avoided." *Id.* Under the prohibition against self-dealing specifically, the Code of Ethics again provides that employees should not "use [their] PNC position or authority if others may reasonably believe that [a] business decision is affected by [their] personal interests, including the interests of relatives and friends." This involves "transact[ing] business on behalf of PNC with respect to [personal] accounts, Extended Family Member accounts, or accounts for anyone whose close relationship ... may reasonably be viewed as creating a conflict of interest." *Id.*, p. 11.

The parties dispute the discipline PNC Bank implements when an employee has violated the Code of Ethics. PNC asserts that under the policy governing self-dealing and conflict of interest, corrective action, including termination, is appropriate for refunding a fee on an employee's or family member's account, or on any account where there might be a conflict of interest. This includes instructing a co-worker or subordinate to refund fees on such an account.

2

According to Ms. May, however, who cites to the Bank's Corrective Action policy in the Employee Handbook, PNC Bank will only immediately terminate an employee for serious conduct, including theft, embezzlement, discrimination, bias, harassment, falsification, and failure to cooperate in an investigation. Ms. May asserts that asking a subordinate to request a fee refund is not one of these enumerated serious offenses that would result in immediate termination.

Around April 2016, Ms. May began reporting directly to regional manager, Raymond DiSandro. As regional manager, Mr. DiSandro was responsible for the sales, service, and operational integrity of approximately 16 of the Bank's branches. The managers for these branches all reported directly to Mr. DiSandro. According to Ms. May, Mr. DiSandro instructed her that she could make decisions that permitted her to bend company policy.

During Ms. May's employment as manager of the Morrisville branch, Adedji Olusanya worked as a branch service and sales associate under her supervision.

For three weeks beginning in April 2017 and continuing through May 2017, Ms. May took FMLA leave after a pregnancy she terminated due to complications. To take leave, she notified the human resources department of the bank. In June 2017, during a phone call, Ms. May notified Mr. DiSandro she was again pregnant. This second pregnancy was high-risk.

The parties dispute the nature of Mr. DiSandro's behavior related to Ms. May's absences involving both pregnancies. According to Ms. May, prior to April 2017, Mr. DiSandro was a supportive supervisor. However, this supportive posture shifted after April 2017, when Ms. May returned from FMLA leave related to the termination of her first pregnancy. Ms. May testified that while she was on leave, Mr. DiSandro considered Ms. May for a work transfer, specifically to work as the manager of the Bank's Bensalem branch. Ms. May testified that this branch was of a "higher grade," one she knew to be associated with higher revenue generation and a safer

3

environment. May Dep. (Doc. No. 18-2) at 123:2-124:5. Ms. May also testified that Mr. DiSandro gave the position to another manager because Ms. May was on pregnancy-related leave, and that he told her he had given the position to another manager because he could not bring Ms. May in for an interview while she was on leave.

With respect to her second pregnancy, Ms. May testified that while she initially told Mr. DiSandro of her pregnancy on a phone call in June 2017, she also told Mr. DiSandro frequently that she would need to attend blood work and other doctors' appointments related to the pregnancy. Between June 2017 until her termination in September 2017, Ms. May attended these medical appointments for which she did not seek FMLA leave. Ms. May also testified that from the date that she told Mr. DiSandro of her pregnancy until the date of her termination, Mr. DiSandro daily complained that it was inconvenient to have a manager out, and he inquired into how frequently and for how long Ms. May would need time off. She further testified that Mr. DiSandro stated the bank branch needed leadership and management and asked how Ms. May would ensure the branch's success in her absence. Ms. May testified that Mr. DiSandro told her "the branch's success could become an issue for the lack of [her] leadership[,]" and "if you want to grow in your career, your branch can't fail." May Dep. (Doc. No. 18-2) at 138:13-14;152:23-153:3. Ms. May testified that she felt "talked down to as a woman." *Id.*

In late July 2017, according to Ms. May, Mr. DiSandro also stated that the Morrisville branch may need to close for lack of production. Further, according to Ms. May, these comments were made in direct response to her notices to Mr. DiSandro of time she needed off to manage her pregnancy-related issues.

PNC Bank asserts Mr. DiSandro was supportive during both of Ms. May's pregnancies.

4

Sometime in July or August 2017, Ms. May contacted the Bank's human resources department to inquire about the steps she would have to take to request FMLA leave after the birth of her child. After speaking with human resources, Ms. May also discussed with Mr. DiSandro who would cover the Morrisville branch after she initiated her pregnancy-related leave. Ms. May testified that after that initial call with human resources, she did not speak to human resources again about her potential leave.

On August 11, 2017, Ms. May requested that her subordinate, Mr. Olusanya, seek a refund on her joint account on which her husband was the primary user. After a refund request was denied related to one of Ms. May's other personal accounts, a Customer Care Consultant reported to PNC Bank that Ms. May called on May 12, 2017, again, to request a refund on this personal account. Consequently, Marquetta Cunningham, a supervisor at PNC Bank's Customer Care Center, researched Ms. May's accounts, and filed a complaint with the bank's Employment Relations Department, charging Ms. May for the misuse of her authority while directing a subordinate to refund fees for a personal account.

PNC Bank assigned Employee Relations Investigator Valerie Walton-Singer to review the complaint. As part of her investigation, Ms. Walton-Singer interviewed Ms. May, Mr. Olusanya, and Ms. Cunningham, reviewed Ms. May's account history, and listened to the phone conversation recordings from August 2017 where Ms. May allegedly requested refunds. During her interview, Ms. May told Walton-Singer that she knew, as bank manager, that she could not transact business on her account or a family member's account. At the conclusion of the investigation, Ms. Walton-Singer determined that Ms. May had violated the Code of Ethics by misusing her position and authority by instructing her subordinate to refund fees on a joint account.

In early September 2017, Ms. Walton-Singer recommended to Mr. DiSandro that Ms. May be terminated for a violation of the Code of Ethics. Ms. Walton-Singer did not consider Ms. May's years of service in recommending termination. According to PNC Bank, Mr. DiSandro did not agree with the recommendation and, instead, forwarded the recommendation to his superior, Cheryl Russo. Mr. DiSandro discussed the recommendation with Ms. Russo and Human Resources Business Partner Janice Fowler. He testified that he wanted to confirm if there were other examples of times where the bank kept an employee employed in similar circumstances. He "didn't want a simple lapse of judgment to create a termination of employment." DiSandro Dep. (Doc. No. 18-3) at 55:17-24. After discussing the recommendation with Ms. Russo and Ms. Fowler, on or around September 5, 2017, Mr. DiSandro eventually agreed with the termination recommendation, based on how similar situations had been handled in the past and the need for the Bank to handle such situations consistently. Ms. May denies the escalation process took place, and the parties contest whether the code violation charged was a serious violation requiring termination. On September 15, 2017, Ms. May was placed on administrative leave. Four days later, PNC Bank terminated Ms. May's employment. About a month later, PNC Bank hired a female, Fatima Khamom, to replace Ms. May as branch manager.[2]

Ms. Walton-Singer also recommended Mr. Olusanya be terminated for a violation of the Code of Ethics, specifically for dishonesty, for his involvement in the refund request. Mr. DiSandro escalated this recommendation because he disagreed with termination, explaining that Mr. Olusanya violated the Code of Ethics at the direction of his manager, and the practice in this situation was to issue a formal written warning to such a subordinate. Again, Ms. May contests

---

[2]     In supplemental briefing dated October 7, 2019 and filed by the parties, they represent that "there is nothing in the [r]ecord regarding whether the female branch manager who replaced [Ms. May] was pregnant at the time she replaced [Ms. May]."

6

this escalation process and the practice asserted. PNC Bank ultimately gave Mr. Olusanya a formal written warning instead of terminating Mr. Olusanya.

Mr. DiSandro testified that he received a report that a teller supervisor at Ms. May's Morrisville branch, Nyna Drula, had been cashing checks for non-customers without a second form of identification. Ms. May testified that she reported this employee to Mr. DiSandro. However, Mr. DiSandro testified to not remembering the details about the report nor how the report was handled subsequently by PNC Bank. Ms. May also does not point to facts related to the details of the report or what occurred with the report ultimately. The parties do not dispute that Ms. Drula remained employed after the alleged report was made.

## LEGAL STANDARD

### I.    Summary Judgment Standard

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

7

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This is true even where . . . the information is self-serving." *Palladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018).

## II. The *McDonell-Douglas* Standard

Ms. May's Title VII sex and pregnancy discrimination claims, as well as her FMLA retaliation claim, are subject to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] Pursuant to the *McDonnell Douglas* standard, with respect to her

---

[3]    *See Neidigh v. Select Specialty Hospital–McKeesport*, 664 F. App'x 217, 220 (3d Cir. 2016) (applying burden-shifting standard to Title VII pregnancy discrimination and FMLA retaliation claims); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) ("Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens

Title VII claims, Ms. May must first establish a prima facie case of discrimination, showing that: (1) she belongs to a protected class (female or pregnant); (2) she was qualified for the position; (3) she was subject to adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discriminatory action. *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 708 (E.D. Pa. 2012). The difference between pregnancy and sex discrimination claims is that pregnancy discrimination claims require an employer's knowledge, or an inference of knowledge, of pregnancy. *Turevsky v. FixtureOne Corp.*, 904 F. Supp. 2d 454, 463 (E.D. Pa. 2012).

To establish a prima facie case for retaliation under the FMLA, Ms. May must show that (1) she is protected under the FMLA; (2) she suffered an adverse employment action; and (3) a causal relationship exists between the decision to terminate her and the exercise of FMLA rights. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

After a plaintiff makes a prima facie showing, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). If the employer succeeds on this point, then "the burden shifts back to the plaintiff 'to convince the factfinder both that the employer's proffered explanation was false . . . and that retaliation [or the protected trait] was the real reason for the adverse employment action.'" *Id.* (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)). Although the burden of *production* shifts under this analysis, the burden of *proof* always stays with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

---

of employment discrimination law."); *Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 555 (3d Cir. 2009) ("We apply the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to . . . retaliation claims under the . . . FMLA.").

If the defendant can meet its burden and show a non-discriminatory or non-retaliatory reason for termination, Ms. May must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [ ] reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *see also Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002).

In discrediting the defendant's proffered reason, the plaintiff cannot simply show that the defendant's decision was wrong or ill-conceived. The plaintiff must show that there is a genuine dispute as to whether discrimination [or retaliation] motivated the defendant's actions. *Id.* at 765. In other words, the relevant inquiry is the perception of the decision-maker, not the plaintiff's view of his or her own performance. *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1993) (pretext turns on the qualifications and criteria identified by the employer, not the categories the plaintiff considers important).

## III. Ms. May's FMLA Interference Claim

With respect to Ms. May's interference claim, as our court of appeals has explained, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlement guaranteed by the FMLA." *Callison v. City of Philadelphia*, 430 F.3d 117, 119-20 (3d Cir. 2005). Thus, the evidentiary burden-shifting framework set forth above does not apply to an FMLA interference claim. Rather, to withstand summary judgment, Ms. May need only point to record evidence that suggests that she was "entitled to a benefit under the FMLA that h[er] employer withheld." *Duncan v. Chester Cnty Hospital*, 677 F. App'x 58, 61 (3d Cir. 2017); *see Turevsky*, 904 F. Supp. 2d at 459 ("Where a plaintiff alleges that an employer has

interfered with an employee's rights under the FMLA, 'the employee only needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them.'"); *see also* 29 U.S.C. § 2615(a)(1) ("[I]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this subchapter.")

## IV.  The Mixed-Motive Theory

Ms. May also asserts that she simultaneously proceeds under a mixed-motive theory with respect to her Title VII and retaliation claims.  PNC Bank contends that because she has not set forth direct evidence of discrimination or retaliation, she may not proceed under such a theory.

The "difference between these theories 'is in the degree of causation that must be shown: in a 'mixed-motive' case, the plaintiff must ultimately prove that [his] protected status was a 'motivating' factor, whereas in a non-mixed-motive or 'pretext' case, the plaintiff must ultimately prove that [his] status was a 'determinative' factor.'" *Middlebrooks v. Teva Pharm. USA, Inc.*, No. 17-412, 2019 WL 438092, at *12 (E.D. Pa. Feb. 4, 2019)  (citing *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016)). In *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Supreme Court held that a plaintiff does not need direct evidence to pursue a mixed-motive case under Title VII.  In that case, the plaintiff had sued her employer for sex discrimination and sexual harassment under Title VII.  Affirming the trial court's jury charge on the mixed-motive theory, despite the petitioner's challenge that the respondent had not adduced direct evidence of discrimination, the Supreme Court reasoned, in part, that on its face, Section 2000e-2(m) does not require a heightened evidentiary burden.  *Id.* at 98-99.  Subsequently, the Third Circuit extended this holding to the FMLA retaliation context. *See Egan v. Delaware River Port Authority*, 851 F.3d 263, 274 (3d Cir. 2017) ("[W]e join our sister circuits in applying *Desert Palace* and holding that direct evidence is not required to obtain a mixed-motive instruction under the FMLA.").

11

Thus, as a matter of law, Ms. May need not proffer direct evidence of discrimination or retaliation to pursue a mixed-motive case. Further, the Court's determination on which theory properly fits Ms. May's case will lie at trial. *See Desert Palace, Inc.*, 539 U.S. at 101 (instructing that a plaintiff can obtain a mixed-motive jury instruction if she has presented sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that her sex or pregnancy was a motivating factor for an employment action); *Connelly*, 809 F.3d at 788 (citing *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995) (holding that "even at trial, an employee 'may present his case under both theories,' provided that, prior to instructing the jury, the judge decides whether one or both theories applies.")).

Further, the parties do not address what impact, if any, the Supreme Court's decision in *Desert Palace* has had on the burden-shifting framework set forth in *McDonell-Douglas. See, e.g.*, *Makky v. Chartoff*, 541 F.3d 205, 214 (3d Cir. 2008) (holding that in a Title VII discrimination case, the *McDonnell Douglas* burden-shifting framework does not apply to a plaintiff's mixed-motive theory in the same way that it would apply in a pretext case because "the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played a 'motivating part' in an employment decision. It is significant that in *Desert Palace*, the Court omitted any discussion of the *McDonnell Douglas* framework as a requirement in mixed-motive cases."). However, the parties do not dispute that the burden of a plaintiff proceeding under the mixed-motive theory is lower than if she were to proceed under a pretext theory. *See, e.g.*, *Duran v. Cnty. of Clinton*, 380 F. Supp. 3d 440, 451 (M.D. Pa. 2019) ("Because we conclude that [the plaintiff] has adduced sufficient evidence to sustain his FMLA retaliation claim 'under the more taxing *McDonnell Douglas* standard,' . . . we need not analyze this claim under a mixed-motives theory of liability.") (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir.

12

2012)). To the extent that the Court finds Ms. May has met her burden under the pretext theory with respect to any of her claims to which the burden-shifting framework applies, the Court need not address whether Ms. May has done so with respect to those claims brought pursuant to the mixed-motive theory.

## DISCUSSION

Applying these standards, the Court first addresses Ms. May's Title VII claims and then addresses her FMLA claims. As noted, the Court will dismiss Ms. May's sex discrimination claim.

## I.    Ms. May's Pregnancy and Sex Discrimination Claims

In her complaint, Ms. May sets forth under Count I a cause of action for sex discrimination under Title VII. Under Count II, she asserts a claim for pregnancy-based discrimination.

For the purposes of summary judgment, the parties assume that Ms. May can establish the first three prongs of a prima facie case of either discrimination claim under the pretext theory. Further, the parties do not dispute that PNC Bank has articulated a legitimate, non-discriminatory reason for Ms. May's termination. Consequently, for the Court's determination with respect to the Title VII claims are the following: (1) whether Ms. May has created a triable issue with respect to the fourth prong of her prima facie claims and (2) whether Ms. May has sufficiently demonstrated pretext.

### a.   Inference of discrimination, the fourth prong of a prima facie case

With respect to her pregnancy discrimination claim, while proof of the elements of a prima facie case may vary depending on the facts and context of the individual situation, "'[c]ommon circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside the relevant class.'" *McCormick v. Allegheny Valley School*, No. 06-3332, 2008

13

WL 355617, at *9 (E.D. Pa. Feb. 6, 2008) (citation omitted). Derogatory or negative remarks can also satisfy the fourth prong of a prima facie case under the circumstances. *See Rossi v. Wyoming Valley Health Care System*, No. 09-0179, 2010 WL 2766343, at *4 (M.D. Pa. July 13, 2010) (holding that the plaintiff had demonstrated a prima face case of discrimination by pointing to derogatory remarks).

Ms. May proffers two types of evidence which she contests raises the requisite factual dispute with respect to her prima facie case. First, she relies on comparator evidence and points to three non-pregnant comparators who she alleges were treated better than she. Specifically, she argues she reported a teller supervisor, Ms. Drula, and that supervisor's superior to Mr. DiSandro for serious infractions involving the falsification of records. Despite this allegedly serious infraction, an arguably worse infraction than hers, Ms. May contests that Mr. DiSandro did not terminate these employees. Ms. May also points to the treatment of her subordinate Mr. Olusanya, who was not terminated although he was involved in the same incident that allegedly led to her termination, to demonstrate Mr. Olusanya is a non-pregnant comparator who fared better than she did.

Second, Ms. May points to disparaging comments made by Mr. DiSandro around the time of her two pregnancies to support the allegation that that she was fired because she was pregnant.

As an initial matter, the Court rejects Ms. May's purported comparator evidence. Comparator evidence can support a showing of disparate treatment; however, proposed comparators must be similarly situated in all material aspects. "The two most important factors in assessing whether an employee is similarly situated to a plaintiff alleging [ ] discrimination are the nature of the offenses perpetrated by the employees and the punishments imposed." *Wooler v. Citizens Bank*, No. 06-1439, 2006 WL 3484375, at *5 (E.D. Pa. Nov. 30, 2006), *aff'd* 274 F. App'x

177 (2008). *See also McCormick*, 2008 WL 355617, at *11 ("Under Title VII, for fellow employees to be considered similarly situated, they must have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (citation omitted). Where a proposed analog is a subordinate, this Court has previously found that such an employee is generally not a proper comparator. *See McCormick*, 2008 WL 355617, at *12 (holding that the plaintiff failed to identify a single viable comparator where plaintiff had proffered as one of the proposed comparators the subordinate of the plaintiff).

In this case, Mr. Olusanya is not Ms. May's actual comparator. The record shows that Mr. Olusanya was disciplined for violating the Code of Ethics under the direction of his supervisor, Ms. May. Thus, his infraction was of a different nature than Ms. May's. There is no dispute here. Further, it is undisputed that Mr. Olusanya is Ms. May's subordinate, and Ms. May does not sufficiently demonstrate how as her subordinate, who is disciplined for a different, although related offense, Mr. Olusanya is sufficiently her comparator.

With respect to the teller supervisor, Ms. Drula, and her purported supervisor, both of whom Ms. May argues remained employed despite committing a "serious offense" under the Code of Ethics, the record does not show what actual charge was lodged against Ms. Drula or the supervisor. Further, Ms. May even testified that Ms. Drula had a different manager. Thus, the Court finds that Ms. May has failed to cite to sufficient record evidence that would render her purported comparators actual comparators. *See Wooler*, 2006 WL 3484375, at *5 (holding that in a gender discrimination case, where two males were allegedly treated better than the plaintiff, these males were not comparators because there was no proof that either man held the same position as the plaintiff or engaged in a similar infraction).

However, Ms. May has otherwise raised the requisite dispute on the fourth prong of her prima facie pregnancy discrimination case. The record reflects that Mr. DiSandro knew of both of Ms. May's pregnancies and made disparaging comments during them with respect to her pregnancy-related absences. These negative remarks included the statement that he had to offer the position of branch manager of the Bensalem branch to another employee due to Ms. May's FMLA leave, and that Ms. May's absences related to her second pregnancy were inconvenient, that the branch needs management, and that the branch could shut down. Further, with respect to the second pregnancy, the record suggests that such comments were made almost daily leading up to Ms. May's termination, and they were made in response to Ms. May's notices to Mr. DiSandro that she may need time away from the office to address pregnancy-related issues. A factfinder could find that the comments raise an inference of discrimination, especially in light of their continued nature, between the date of her first pregnancy, around April 2017, to her termination in September 2017. Consequently, the Court finds that Ms. May has adequately set forth the fourth prong of her prima facie case of pregnancy discrimination.[4]

---

[4] PNC Bank cites to several cases to support the position that each of Mr. DiSandro's comments were far less egregious and less connected to Ms. May's protected trait than the disparaging comments made in the cases. Instead, according to the Bank, Mr. DiSandro's comments show, at most, a manager trying to coach his subordinate toward success. However, the Court rejects this argument and finds that these cases are inapposite. For example, PNC cites to the Third Circuit Court of Appeals decision in *Pivorotto v. Innovative Systems, Inc.*, 191 F.3d 344 (3d Cir. 1999) to support the position that Mr. DiSandro's comments were stray. However, in that case, the chairman who made the disparaging comments about women did not make or was not involved in the decision to terminate the plaintiff. *Id.* at 359. Here, there is a genuine dispute as to whether Mr. DiSandro was the ultimate decision maker, but at the very least, the record reflects he was a decision-maker in firing Ms. May. In *Weightman v. Bank of New York Mellon Corp.*, 722 F. Supp. 2d 693 (W.D. Pa. 2011), the court found that an individual's failure to be happy, congratulatory, or encouraging failed to proffer direct evidence that the plaintiff was fired because of her pregnancy. *Id.* at 704. Mr. DiSandro's comments were more than an omission of happiness or encouragement. PNC Bank also cites to this Court's previous decision in *Robinson v. Mondelez Int'l, Inc.*, 228 F. Supp. 3d 448, 455 (E.D. Pa. 2017). However, in that case, the questions about when the plaintiff was going to retire were made outside of the context of the employment decision.

16

*b. Pretext*

Ms. May also contends that she has established pretext for many of the same reasons that she can establish an inference of discrimination under her prima face case. For the same reasons that the Court finds that she has created a genuine dispute as to her prima facie case by pointing to Mr. DiSandro's negative comments, the Court also determines that those disparaging comments are sufficient evidence of pretext. *See DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 582 (E.D. Pa. 2010) ("'In cases where employees offer discriminatory comments in order to show pretext, it is important to consider the relationship between the speaker and the employee, the timing of the comment, and the purpose and content of the statement.'")

However, Ms. May's most vigorous argument purports an inconsistency, a theory that the Court now turns to and finds, prevails.

A defendant's inconsistent explanations of who made the decision to terminate the plaintiff may raise an inference of pretext. *See generally Latessa v. New Jersey Racing Comm'n*, 113 F.3d 1313, 1326 (3d Cir. 1997) ("Our precedent requires more than a mere possibility that a trier of fact might disbelieve an employer's explanation for its employment decision; it requires that the plaintiff offer some evidence that would support the trier of fact's disbelief.") (emphasis omitted). Here, on the one hand, in interrogatory responses, PNC Bank stated Ms. Walton-Singer, Mr. DiSandro, Ms. Russo, and Cynthia Burke were involved in the decision to terminate Ms. May. Interrogatory Responses (Doc. No. 18-3), p. 13. However, in Mr. DiSandro's deposition, he testified that he was the only individual involved in making the decision to terminate Ms. May. DiSandro Dep. (Doc. No. 18-3) at 54:13-17. While Mr. DiSandro testified that there were others, including Ms. Russo and Ms. Fowler who were involved in discussions about the decision, he explained that he did not remember speaking with any Cynthia Burke on Ms. May's case. (*Id.* at

54:18-55:6). This inconsistency creates a triable issue with respect to pretext, and a jury could find that the contradictory explanations of who was involved in Ms. May's termination undermines the bank's proffered non-discriminatory reason for termination.

Ms. May also testified that while she received some training on and read PNC Bank's employee conduct policies, including the Code of Ethics, she was told by Mr. DiSandro that she should use her discretion in bending such policies. The Court finds this also supports Ms. May's position and further creates a genuine dispute as to the issue of pretext.

In sum, the comments made by Mr. DiSandro and these purported inconsistencies together do manage to raise the requisite doubt related to whether PNC Bank terminated Ms. May for a legitimate reason. For all of these reasons, the Court denies summary judgment with respect to Ms. May's pregnancy-based discrimination claim.

  c. *Sex discrimination claim*

"Courts analyze [pregnancy discrimination claims] as sex discrimination under Title VII." *Brown v. Aria Health*, No. 17-1827, 2019 WL 1745653, at *5 (E.D. Pa. Apr. 17, 2019). Curiously, while Ms. May avers in her complaint that the basis of her gender discrimination claim is her pregnancies and the actions allegedly taken by PNC Bank after she disclosed her pregnancies to Mr. DiSandro, at the summary judgment stage, Ms. May seeks to distinguish her sex discrimination claim from her pregnancy discrimination claim on the basis of, again, purported comparator evidence related to Mr. Olusanya and Mr. DiSandro's disparaging comments.[5] The Court finds that the sex discrimination claim cannot be sustained, as presented. Ms. May has not,

---

[5]    At oral argument, counsel for Ms. May represented that the basis of Ms. May's sex discrimination claim is her proposed comparator proof related to Mr. Olusanya. However, in her position papers, Ms. May also relies on purported comments that she claims made her feel subordinate to Mr. DiSandro. The Court will address both prongs of Ms. May's argument.

either under a mixed-motive theory or a pretext case, demonstrated that her sex, apart from her pregnancy, was a motivating or determinative factor in her termination.

First, with respect to her purported comparator evidence, for the same reasons that the Court has rejected Mr. Olusanya as a comparator with respect to Ms. May's pregnancy discrimination claim, the Court also rejects him as a comparator regarding her sex discrimination claim. Again, Ms. May has not demonstrated how her subordinate who is ultimately disciplined for a substantively different offense is in fact her comparator.

With respect to the disparaging comments made by Mr. DiSandro to Ms. May, Ms. May cites the following comments in support of her sex discrimination claim: (1) to make sure that the branch does not fail; (2) transferring to the Morrisville branch is an opportunity and she needs to succeed; (3) if she wants to grow in her career, the branch cannot fail; and (3) this is a dog eat dog world. Pl.'s Response to Def.'s Statement of Material Facts (Doc. No. 19-1) at ¶ 59 (citing May Dep. 152:17-154:4). Ms. May contends that these comments support her sex discrimination claim because she felt "talked down to as a woman." *Id.* (citing May Dep. 153:4-17).

Initially, it is well-settled that an employee's subjective perceptions, without more, cannot raise an inference that a plaintiff's protected trait was the motivating or determinative factor in an employer's adverse employment action. *See, e.g.*, *Boykins v. Lucent Technologies, Inc.*, 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000) (rejecting assertions of pretext that involved allegations of a supervisor mistreating the plaintiff on account of his race because the plaintiff conceded that the assertions were based solely on his perception of disparate treatment). Without these subjective assertions, Ms. May's purported proof of Mr. DiSandro's negative remarks appear to be of the same exact vein as those comments she uses to support her pregnancy discrimination claim. Thus, the Court does not discern a functional or substantive difference between her sex and pregnancy

discrimination claims as presented by Ms. May, no matter how Ms. May labors to distinguish them. Stripped of the evidence that fails to support Ms. May's sex discrimination claim, the claim cannot stand on its own. The Court will dismiss the claim.

## II.     FMLA Retaliation Claim

As noted above, to establish a prima facie case for retaliation under the FMLA, a plaintiff must show "(1) [s]he took" or invoked "FMLA leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse decision was causally related to h[er] leave." *Conoshenti,* 364 F.3d at 146; *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("[W]e interpret the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave."). "The main factors in determining a causal link between a protected activity and an adverse employment action are timing and a pattern of antagonism between the two." *White v. Sch. Dist. of Philadelphia*, No. 05-0092, 2008 WL 2502137, at *7 (E.D. Pa. June 19, 2008), *aff'd,* 326 F. App'x 102 (3d Cir. 2009). After the plaintiff has made a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant carries that burden, the burden shifts back to the plaintiff to prove that the legitimate reasons were not the defendant's true reasons, but instead were pretextual.

It is undisputed that Ms. May took FMLA leave with respect to her first pregnancy. A reasonable jury could also find that Ms. May invoked her FMLA right with respect to her second pregnancy when she contacted her employer's human resources department to inquire about leave after giving birth. Further, it is undisputed that Ms. May was terminated, and that her employer proffered a non-discriminatory reason for firing Ms. May (a Code of Ethics violation). Thus, the

crux of the parties' dispute is found in whether Ms. May can set forth the third prong of her prima facie case (causation) and whether her employer's reason for her termination was really pretext.

For the same reasons that the Court finds Ms. May has demonstrated an inference of pregnancy-based discrimination, and has met her burdens with respect to that claim under the prima facie case and pretext, the Court also determines that she has created a genuine dispute of material fact with respect to whether her termination was motivated in part by her taking and invoking FMLA leave. The record shows that after Ms. May returned from her three-week FMLA leave in May 2017 after her first pregnancy was terminated, almost every day, until the date of her termination, Mr. DiSandro engaged in a pattern of antagonism making remarks that she was not given a managerial position because she was out on FMLA leave and that it was inconvenient having her out despite that her absences from work related to her second pregnancy. This proof, the pattern of antagonism, coupled with the temporal proximity of her FMLA leave and/or invocation of leave, raises the requisite factual dispute with respect to whether Ms. May was terminated due to her invoking and taking leave.

Furthermore, the Court finds that the same evidence of inconsistencies and antagonism that supported a showing of pretext under the pregnancy discrimination claim also establishes the requisite factual dispute with respect to pretext on the retaliation claim. Consequently, the Court will permit the FMLA retaliation claim to proceed.[6]

---

[6]    Notably, PNC Bank's basis for contesting the retaliation claim is that even under the lesser burden set forth by the mixed-motive standard, Ms. May cannot meet her evidentiary burdens on this claim. Then, in a footnote, the employer states that to the extent the Court assesses the claim under a pretext analysis, it relies on its arguments set forth prior as to Ms. May's claims. As noted above, because the Court has found Ms. May can proceed under the pretext theory, the Court need not address whether she can do so pursuant to the mixed-motive theory. But even if the Court were to, PNC Bank's argument loses because Ms. May has met her burden even under the mixed-motive theory. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 598 F. App'x 109, 113 (3d Cir. 2015) (noting that all a plaintiff has to do under the mixed-motive case to shift the burden of persuasion to her employer is to show that the invocation or taking of FMLA leave was a negative factor in the decision to terminate the employment). The Court also notes that the matter of

## III.   Interference Claim[7]

Finally, with respect to the FMLA interference claim, the FMLA provides eligible employees the right to take up to twelve-weeks of leave in any twelve-month period if a "serious health condition . . . makes the employee unable to perform the functions of the position[.]" 29 U.S.C. § 2612(a)(1)(D). Further, the statutory framework provides that an employer may not interfere with or otherwise deny the exercise of the rights provided by the FMLA. 29 U.S.C.

§ 2615(a)(1). As noted above, to prove an FMLA interference claim, Ms. May need only show that she was entitled to benefits under the FMLA and was denied them. *Egan*, 851 F.3d at 270 ("The right could be interfered with by, for example, prohibiting the individual who has such a condition from being permitted to take such leave or by requiring the person to engage in significant work while on FMLA leave."). The statutory scheme does not, however, provide protection against termination for a reason other than interference. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007) (noting that if the employer could prove at trial that it terminated the plaintiff for other reasons than his intention to exercise his FMLA rights, the plaintiff could not prevail).

PNC Bank offers three basic arguments in support of its challenge to the claim. First, it argues that on the merits of the claim, Ms. May has not established she is even entitled to FMLA rights.   Second, PNC Bank argues that it must prevail because it terminated Ms. May's employment for reasons other than her invocation of FMLA leave.

---

whether PNC Bank would have terminated Ms. May regardless of her invocation of or taking FMLA leave is a potential matter for a jury. While the defendant claims this defense renders it liability proof, it will be up to a jury to decide whether to give credit to PNC Bank's assertion that the FMLA leave did not affect its determination to terminate Ms. May.

[7]     At oral argument, counsel for Ms. May clarified that she was asserting her interference claim with respect to her second pregnancy only.

22

Third, the defendant contends the interference claim is barred for being redundant of the FMLA retaliation claim.

Initially, the Court rejects the challenge to the claim insofar as it rests on the notion that Ms. May has failed to demonstrate that she was entitled to FMLA leave. The basis for the challenge is the argument that because Ms. May pleads that she *would* have been entitled to benefits after the delivery of her child had she not been fired, she has not even alleged in her complaint her entitlement, let alone proffered factual support to sustain it.

This argument misses the mark. Our court of appeals has explained that to have been entitled to FMLA benefits, an employee must have provided notice to her employer of the need for leave. *See Sarnowski*, 510 F.3d at 401. In *Sarnowski*, the appellate court vacated the summary judgment on an FMLA claim in a case where an employee claimed that his employer interfered with his FMLA rights by terminating him after he had notified the employer that he may need time off for a heart surgery. *Id.* at 401. While the district court granted summary judgment because the plaintiff did not submit a formal request and thus was not entitled to benefits under the FMLA, the court of appeals held otherwise—because the employee had provided some verbal notice to make his employer aware of the need to potentially take FMLA leave, such was sufficient notice. *Id.* at 402.

Here, the semantics of whether Ms. May *would* have been entitled to FMLA leave if she had not been terminated are of no matter. Under the law, once Ms. May shows she provided some notice of her intent to exercise her FMLA rights, she triggered her entitlement. Thus, PNC Bank's argument fails.

Furthermore, with respect to PNC Bank's contention that Ms. May was terminated for reasons other than interference with her rights, that is an issue for trial because Ms. May has

demonstrated sufficiently that invidious reasons for her termination could have been the reason for her termination, sufficient to raise a fact dispute as to whether her employer would have fired her even if she did not seek leave.

Finally, as to the redundancy claim, PNC Bank contests that there is no real distinction between Ms. May's FMLA retaliation and interference claims, and for this additional reason, the interference claim must be dismissed. It cites to Third Circuit case law, for example, *Lichtenstein v. University of Pittsburgh Medical Center*, 598 F. App'x 109 (3d Cir. 2015), to support the proposition that a plaintiff may not proceed with her interference claim if it is, in form and substance, a claim for retaliation.

In *Lichtenstein*, the plaintiff had claimed that her employer interfered with her FMLA rights because her request for leave was a negative factor in the decision to terminate her. *Id.* at 114. Noting that for an interference claim to stand on its own, a plaintiff must show that FMLA benefits were withheld, and the plaintiff had not alleged that any benefits had been withheld, the appellate court determined that the district's court's dismissal of the interference claim for redundancy was not in error. *Id.*

Here, Ms. May's interference and retaliation claims are not identical in form or substance, albeit they are closely and finely related. Ms. May does not claim that her interference is based solely on the fact of her termination due to her invocation of or taking FMLA leave. Rather, as to her interference claim, she has argued but-for her termination, she would have been entitled to and would have taken FMLA leave after the birth of her child. In other words, she claims she was denied the benefits provided by federal law because she was fired. Her interference and retaliation

24

claims are not the same. Consequently, on the notion that her claims are redundant, the Court denies summary judgment.[8]

## CONCLUSION

For the aforementioned reasons, the Court denies in part and grants in part the motion for summary judgment, denying only with respect to the sex discrimination claim. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[8]     Taken to its logical end, if the defendant's argument prevailed in this case, such a ruling would render the statutory and regulatory scheme as to interference claims meaningless, merely because in the same case, Ms. May brought an FMLA interference claim alongside a retaliation claim. Such a proposition cannot stand.

25